SAM FARULLA, as President of Doll and Toy Makers' Union, an Unincorporated Association Consisting of More Than Seven Members, Plaintiff, v. RALPH A. FREUNDLICH, INC., Defendant.

Supreme Court, New York County, December 1, 1934.

*Emil Schlesinger*, for the plaintiff.

*Lind, Shlivek, Marks & Brin* [*Max Shlivek* of counsel], for the defendant.

BLACK, J. This is a suit by plaintiff to enforce performance of an agreement between the plaintiff and defendant which provides, among other things, for a " closed shop." Defendant contends in this case that the making or performance of such a contract was unlawful and void because it was prohibited by section 7-a of the National Industrial Recovery Act (U. S. Code, tit. 15, § 707, subsection [a]).

At the end of the trial, which occupied nearly a month, this court, realizing how desirable it was to have as speedy a decision as would be consistent with proper consideration, suggested to counsel on both sides that if there should be a preliminary decision in favor of defendant on its main legal contention that section 7-a forbade a closed shop, it would then only be necessary for them to submit memoranda on the other points of the case.

The court stated that if its preliminary decision was that there was nothing in section 7-a of the National Industrial Recovery Act to forbid the making and performance of a contract for a " closed shop " it might then be possible for the parties to compromise their contentions and settle the case upon that finding of the court. This suggestion of the court, that the effect of section 7-a of the National Industrial Recovery Act be passed upon first, was cheerfully acceded to by counsel, especially as the defendant announced his willingness to re-employ certain members of plaintiff's union if the court should decide that the contract sued on did not violate

the provisions of section 7-a of the National Industrial Recovery Act. This offer of the defendant appears in the following extract from the examination of Mr. Freundlich: On cross-examination Ralph A. Freundlich, president of the defendant, testified (excerpts from stenographer's minutes): " Q. And while I was examining * * * the plaintiff's witnesses you heard Mr. Shlivek [defendant's counsel] make the announcement to the court and ask Mr. Esposito [plaintiff's business agent] whether he was willing to send up all of the workers at your plant to Clinton, Massachusetts. Do you remember that? A. Yes, I do. Q. Let me ask you, are you ready to take all of your workers in the New York factory to Clinton, Massachusetts, and employ them there in strict accordance with the agreement of Mr. Stone? A. I am. * * * Q. Are you ready to take to Clinton, Massachusetts, so many workers who are members of the plaintiff union as you may require in your factory in Clinton, Massachusetts? A. Yes. Q. Even though they did not work for you in New York? A. Yes. * * * Q. Mr. Freundlich, do you agree on behalf of the defendant to employ in Clinton, Massachusetts, in strict conformity with the agreement of May 25, 1934, each and every worker heretofore employed in the defendant's factory in New York who may apply for work at the defendant's offices in 200 Fifth avenue, New York city, or at the defendant's factory in Clinton, Massachusetts? * * * A. I will. Mr. Shlivek: You mean you are willing to do that? The witness: I am willing to do it, provided —— Q. I ask you, do you agree on behalf of the defendant to do that? Do you or do you not? A. I do agree, providing that the court eventually finds that that contract is binding. Q. And do you agree that if the defendant shall require any workers in Clinton, Massachusetts, additional to the members of the plaintiff union who are now employed or may hereafter be employed in Clinton, Massachusetts, to employ, in the first instance, only present members of the plaintiff union who may apply for work either at the defendant's office in 200 Fifth avenue or at the defendant's factory in Clinton, Massachusetts? Mr. Shlivek: I submit that it is the very same question, except he says, ' in the first instance.' The first question is broader. It says, under any conditions do you agree to take the old workers? The Court: I do not understand what you mean by ' the first instance.' Mr. Schlesinger: The first question relates to the workers who are employed in the factory in New York. That was the first question. The second question relates to any other worker in the city of New York who is a member of the plaintiff union, but who was not employed by the defendant in its factory. In other words, having taken up the workers from New York city, or so many of them as

agreed to go from the New York factory; the next question that I want to know is: Does he make the same agreement with respect to any of the other workers in New York city, the preference to be given to the workers in New York city rather than to any workers who are in Clinton, Massachusetts, and who were never members of the plaintiff union? Does your Honor follow me? The Court: I understand. * * * Q. Bearing in mind——. A. Under the same condition, subject to the court's ruling. * * * Mr. Schlesinger: Will you read the question, please? [Question read as follows: ' I am trying to find out from this witness whether or not his firm will not ask workers to join, but whether his firm undertakes that it will employ nobody in Clinton, Massachusetts, unless they are members of the plaintiff union. And if he can get no workers in Clinton, Massachusetts, who are members of the plaintiff union, then he may go out in the open market and obtain any workers to work for them with the proviso that these workers must become members of the union within the time stated in the agreement. In other words, I want to know whether this particular witness is ready to state to the court that, assuming the agreement is legal, he is willing to abide by paragraph second in all of its phases relative to the closed shop.'] Mr. Shlivek: May I add the one statement, provided that this court determines —— The Court: That is all in. Mr. Shlivek: —— that closed shop provisions are legal. The Court: All right; put that in. Mr. Schlesinger: That is in there. Mr. Shlivek: It was not in specifically. A. Yes. Q. *And that answer applies to all apprentices and all other workers in the factory, does it not?* Mr. Shlivek: If your Honor please, there is nothing in the agreement on apprentices, and that is why I object to that. Let us make it apply to the agreement as is. The Court: No, I am going to rule on all the questions as they come along. Mr. Shlivek: I respectfully object to it on the ground that there is no provision in the agreement with respect to the employment of apprentices. The Court: I will overrule your objection. Mr. Shlivek: I respectfully except. The Court: You have a definite ruling on the question including the apprentices, and the question not including them. So that we will see just how the whole thing is all the way through. * * * By the Court: Q. Let me see if I get your idea, and you do not have to answer me if you do not want to, either with or without an objection: Do I understand it to be your position that you are willing, as you stated in your last answer, but that you are afraid you might be violating the National Recovery Act, and you want to buttress your position by a decision of this court as to whether you are violating the National Recovery Act; is that the idea? A. Yes, sir."

Notwithstanding the too prevalent tendency of some courts during this distressing period to render invertebrate and hermaphroditic opinions that are intended to please both parties to a litigation, but which in fact satisfy neither, this court prefers to first write a clear-cut decision upon the legal proposition, which the parties to this litigation may use as a basis of settlement if they so desire.

Owing to the fact that there has been no decisive adjudication upon the point by any high court since the passage of the National Industrial Recovery Act in June, 1933, and because its decision not only affects the important industry involved in this case but because the final correct decision of the point will affect every similar contract between employer and employees for a " closed shop," counsel have presented splendid briefs upon the preliminary question of whether the contract in this case for the closed shop violates section 7-a of the National Industrial Recovery Act. The court has carefully examined these briefs and has made an independent study of the constitutionality of the National Industrial Recovery Act. The first thing to consider is whether section 7-a of the National Industrial Recovery Act violates the Constitution of the United States. If it does violate the Constitution of the United States it cannot prohibit the making of the contract sued upon in this case. If it does not violate the Constitution, and is constitutional, then this court must decide whether by its own terms, or any reasonable implications, it prohibits the " closed shop " provided for in the agreement sought to be enforced by the plaintiff in this case.

The court has no doubt of the constitutionality of section 7-a of the National Industrial Recovery Act.

It is necessary first to study the plaintiff's and defendant's contentions.

Plaintiff, the Doll and Toy Makers' Union, in its complaint says that it is composed of 1,800 members, comprising a substantial majority in the doll industry in this area. This is an action against Ralph A. Freundlich, Inc., a doll manufacturer. That the members of the union pay certain dues and assessments, which constitute its principal source of income. That it declared a strike August 29, 1933, in New York and Trenton, which caused a cessation of work in the doll industry there. That about September 21, 1933, the Labor Mediation Committee of the National Industrial Recovery Administration in New York invited the plaintiff union and the manufacturers to attend a conference to settle the strike. That about the 29th of September, 1933, the memorandum of an agreement was reached between the Doll Division of the Toy and Playthings Industry (including the defendant) and the plaintiff union. That the agreement provided for giving full recognition to the union,

and for certain increases, a forty-hour week, and other conditions, and that a collective agreement should be entered into between the employers' association and the union at the earliest possible date prior to January 1, 1934, which would provide a permanent scale of wages, hours and other matters, and in the event of any disagreement regarding the collective agreement the dispute was to be referred to the National Recovery Administration, whose decision was to be final and binding upon both parties.

The collective agreement was to contain terms to protect both parties, and the union was not to give any more or variable terms to any employer than it gave to the employers' association.

The collective agreement was also to provide stated pay day for wages and be signed by each employer. That thereafter, about October 2, 1933, the plaintiff union refused to approve the memorandum of the proposed agreement, relegating further decisions to the shop chairman chosen by the workmen. That about October 3, 1933, representatives of the doll manufacturers of New York visited a meeting of the shop chairmen and promised if the strike order was rescinded and workers returned to their shops immediately the association would negotiate for an agreement to be effective until June 1, 1935. That the shop workers thereupon decided that the workers should return to work and they did. That thereafter there were conferences between representatives of the plaintiff union and of the Doll Manufacturers Association which resulted in an agreement on October 28, 1933. That agreement set out that unless the Regal Manufacturing Company of Trenton entered into a collective agreement, the members of the Doll Manufacturers Association signing this agreement would be seriously discriminated against and handicapped, and the plaintiff union undertook to enter into a similar agreement with the Regal Company. The agreement then provided that if such an agreement was not made with the Regal Company on or before February 1, 1934, that the Doll Manufacturers Association might elect to terminate this agreement, in which event all the individual members of the association would be released from any performance thereof. That thereafter the Regal Company refused to enter into such an agreement. That on November 4, 1933, a Code of Fair Competition for the Toy and Playthings Industry was approved by the President pursuant to the National Industrial Recovery Act. That said Code provided for twelve dollars a week of forty hours, for a period of apprenticeship of six weeks at not less than nine dollars and sixty cents for forty hours (limiting the apprentices to ten per cent of the total employees), " for a tolerance period for overtime of 96 hours a year, with time and one-third pay for overtime," and for the prohibition of home work.

On February 15, 1934, the Doll Manufacturers Association abrogated the agreement of October 28, 1933, because the Regal Doll Company had not come into it. That thereupon plaintiff union prepared for a general strike in New York and Trenton against the doll manufacturers. That on February 19, 1934, the Regional Labor Board, created under the National Industrial Recovery Act, called a conference to avert the strike. That on March 1, 1934, an agreement was entered into by about seventy-five per cent of the doll manufacturers (including defendant Ralph A. Freundlich, Inc.) and the plaintiff union, and the Doll Workers Union, Local 1824 of Trenton, to arbitrate their differences, the plaintiff union agreeing to call no strike, and the manufacturers and unions agreeing to arbitrate rates of wages, hours, conditions of discharge and employment, etc. The seventy-five per cent of doll manufacturers consisted of forty-eight out of sixty-eight manufacturers in New York employing some 2,000 workers, and the twenty manufacturers employing some 700, not including those employed by the Regal Doll Company of Trenton. That the New York Regional Labor Board selected Dr. Yahum I. Stone as arbitrator. A mutual agreement was reached between the parties on all questions except hours and wages (and as to articles 24 and 26 of the arbitrator's award, which are not germane to the present observations). That on May twenty-fifth the arbitrator filed his decision on the disputed points, incorporating therein the part which had been mutually agreed upon between the parties to the arbitration with the New York Regional Labor Board, thereby in accordance with its terms making it the agreement between the parties to this suit. This agreement contained in the award of Dr. Stone provided that the manufacturers would employ only members of the union, except that if the union were unable to furnish them the manufacturers might employ others, provided they should obtain working cards from the union and that in the event members of the union were in arrears in dues and assessments and the employers have been served with written notice, the employers would, at the union's request, deduct such arrearages from the salary of the employees and turn it over to the union. The agreement also provided for a forty-hour week of five days of eight hours, with overtime during September, October, November and December, not to exceed eight hours a week (which might at the option of the members be done on Saturdays) at the rate of time and a half. There were not to be more than two shifts a day. And during the overtime period the total number of hours should not exceed ninety-six. During the term of the agreement the wages were to be as shown on Schedule " A " attached to the finding of Dr. Stone.

Except apprentices, employees who had worked for more than two weeks should not be discharged except for good cause. Disputes about discharge should be left to arbitration.

Section 9 of the agreement provided against lockouts and strikes pending the determination of any complaint.

Section 11 prohibited subcontracting. All disputes were to be submitted, first, to an adjustment board of six, and finally to an arbitrator.

The agreement was to continue until June 1, 1935. If no notice of a desire to change was given by February 1, 1935, the agreement was to continue until June 1, 1936.

Plaintiff claims that defendant violated this formal and thoroughly considered agreement, so solemnly entered into after such thorough consideration to pay the wages agreed upon, by placing additional duties upon its workers not contemplated in the scale (Schedule " A "), by sending out materials to contractors and subcontractors who had it worked up by home-workers, by willfully locking out its members in the city of New York, by establishing a factory at Clinton, Mass., where it employs workers not in good standing in plaintiff union, at wages lower than the award, and by employing more than ten per cent of its workers as apprentices or learners.

Plaintiff says that it made repeated efforts to create an adjustment board, but that defendant failed and refused to co-operate; that on July 5, 1934, it filed specific charges with the Regional Labor Board involving the violations by defendant complained of by the union, and that defendant continues to violate the agreement embodied in the finding of Dr. Stone, the arbitrator.

Plaintiff now demands that defendant be restrained and enjoined until June 1, 1935, from violating, abrogating or rescinding the terms of the contract, from employing persons who are not members in good standing of the plaintiff union, from manufacturing or causing dolls to be manufactured in New York city or Clinton, Mass., at any establishment which does not employ plaintiff members, whether such establishment be operated under its own name or by any others for defendant's account, from sending goods to be manufactured into dolls and any accessories thereof, to contractors or subcontractors, from manufacturing them in the establishment of contractors or subcontractors, from locking out workers of plaintiff in good standing and who were employed by defendant since March 1, 1934, from paying its workers a rate of wages less than the amount stipulated in the intermediate and final awards and the collective agreement incorporated therein dated May 25, 1934, rendered by Dr. Stone in pursuance of the agreement between plaintiff union and defendant employer March 1, 1934, from employing any

apprentices, so long as there are members of plaintiff union who are unemployed, and from employing more than ten per cent of its total number of employees as apprentices or learners, and from employing any person as an apprentice or a learner for a longer period than six weeks, from sending or causing to be sent materials to the homes of any persons for the manufacture of dolls or accessories, from adding to the duties of its workers work not contemplated in the award of May 25, 1934, without giving adequate compensation for it, and from adding duties to its workers not contemplated in the wage scale set forth in the said award, from using any means of doing the above acts, and that defendant account to the plaintiff for damages for breach of the contract, and for such other and further relief as may be just and proper.

Defendant admits that it signed the document of March 1, 1934, and that Dr. Stone rendered the decisions of March 19 and April 19, 1934, and denies or fails to admit most of the other allegations contained in the plaintiff's complaint.

For a first separate and distinct affirmative defense defendant says that the temporary decisions rendered by Dr. Stone on March 19 and April 19, 1934, and the decision and proposed agreement prepared and rendered by Dr. Stone May 25, 1934, are void and unenforcible for failing to comply with section 31 of the Personal Property Law because no sufficient note or memorandum thereof was made in writing, although by its terms the agreement was not to be performed within one year from the making thereof.

For a second separate and distinct defense defendant says that the temporary decisions of Dr. Stone and his final decisions are void and unenforcible, because they violate the specific provisions of section 7-a of the National Industrial Recovery Act of June, 1933, which forbids a closed shop.

For a third separate and distinct defense defendant says that the decisions of Dr. Stone tended to create a monopoly, and are, therefore, void.

For a fourth separate and distinct defense defendant says that the contract embodied in Dr. Stone's decisions is void as against public policy.

As to the " second separate defense " pleaded by defendant that the decisions of Dr. Stone and the contract embodying them are void and unenforcible because they violate the specific provisions of section 7-a of the National Industrial Recovery Act of June. That act was passed in June, 1933, and if, as this court held in the case of *People* v. *Harris* (153 Misc. 390), and it now holds, the National Industrial Recovery Act is constitutional, it must be analyzed to see whether or not it forbids the closed shop provided

for in the contract sued on. Section 7-a of the act reads as follows: "Every code of fair competition, agreement, and license approved, prescribed, or issued under this title shall contain the following conditions: (1) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; (2) that no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing; and (3) that employers shall comply with the maximum hours of labor, minimum rates of pay, and other conditions of employment, approved or prescribed by the President."

At the time of making the contract sued on in this court the principles of the National Industrial Recovery Act had also been incorporated into the law of the State of New York in the so-called Schackno Act (Laws of 1933, chap. 781).

At one of the meetings which considered the collective agreement the minutes show the following: "Dr. Stone: What do you wish to take up now? Mr. Shlivek: Dr. Stone, it occurs to me that the first part of Article Second, of the October 28, 1933, agreement which reads: ' The Association agrees that its members will employ only good standing members of the Union who carry the working cards issued by the secretary of the Union,' is in conflict with 7-a of the National Recovery Act. I am not raising this as a question — that we will not or are not willing to employ union help alone. *The manufacturers have agreed to employ union help on a fair and equitable basis. They are perfectly satisfied to continue doing that. Those who have joined in this arbitration and the other closed shops are willing to use union help exclusively,* but there is a very serious question in my mind whether the incorporation of such a paragraph in the agreement would be in conflict with 7-a of the National Recovery Act. [Mr. Shlivek is counsel for defendant in this court.] Dr. Stone: There are a number of agreements — a number of codes in existence today under which there is a closed shop agreement. No one has ever raised the question. *If you had today in one of your shops union workers and non-union workers, then the question could very well be raised by you, but you have today union shops in which you employ exclusively union help.* This is not in conflict with section 7-a, which guarantees to the workers the right to form an organization of their own without pressure from the employers.

They have formed such an organization. All your employees are members of that organization and they have a perfect right under the law to enter into an agreement outside of the Code — enter into an agreement with their employers for the exclusive employment of their members. Mr. Shlivek: I differ with you — I may be wrong. Look at the cloak and suit code which has a strict union-help clause; look at the clothing code which has a closed shop agreement; the dress code the same way. Isn't it a fact that these codes include an agreement which stipulates that the employers will not discriminate against the employees because they are or are not union members? I am almost sure they do. Dr. Stone: You can get that information from any one of the many agreements covering the various industries. They have separate codes in which they provide for the employment of union help exclusively. *If you raised here the question of being opposed to it, we are perfectly willing for you to go on, but if you aren't opposed to the exclusive employment of union help there is nothing in the law to interfere.* I am perfectly willing to go on record to that effect because I know that there are several industries in which there is an exclusive union agreement and they are operating under codes. If that is illegal, it would have been raised long ago. Mr. Frisch [a doll manufacturer]: We had agreed to recognize only the A. F. L. Mr. Levy [attorney for Regal Doll Company]: I understand that the only question you raise is the possibility of such a clause being in conflict with the National Recovery Act *but that you are not raising the question of using other than union help."*

Then the investigation Mr. Shlivek was attending went steadily forward to the completion of the finding of Dr. Stone, which makes no reference to any prohibitions in section 7-a of the National Industrial Recovery Act.

A first reading of the section 7-a of the National Industrial Recovery Act led the court to believe that it in no way forbade a voluntary mutual agreement between an employer and a union for a closed shop. But counsel for the defendant employer urged with so much earnestness that it did prevent a voluntary mutual agreement for a closed shop, that the court has given much additional study to the history of the section and its meaning.

It will be observed that section 7-a of the National Industrial Recovery Act starts out with the proposition that every code of fair competition agreement and license prescribed shall contain the conditions set out in it. Of course this means that not only is the code to contain such provisions, but that after the code contains them the provisions shall be enforced. The code for the doll industry did contain such provisions. The object of section 7-a is to

give employees the right to organize and to bargain collectively through their representatives and to be free from the coercion of employers.

Section 7-a as originally drafted read that " no employee and no one seeking employment shall be required as a condition of employment to join any organization or to refrain from joining, organizing or assisting a labor organization of his own choosing." But subdivision 2 of section 7-a was amended by inserting the words " company union " for the word " organization," so that subdivision 2 now reads that " no employee and no one seeking employment shall be required [by his employer] as a condition of employment [by such employer] to join any *company* union." So far as appears from the evidence defendant has organized no company union, so this part of section 7-a has no application to the case now before the court. Nor has the defendant employer required any one seeking employment to join any company union or to refrain from joining, organizing or assisting a labor organization of his own choosing. What the defendant employer has done is to agree that he will not employ workers who are not members of the union. He entered into this agreement voluntarily for the purpose of settling a disagreement. The agreement was only entered into after full and free discussion between the union and the defendant and other members of the employers' association in the doll industry. The consideration for the manufacturers entering into it was to secure industrial peace and to promote production. Counsel for defendant appeared to present the views of defendant or the association of which it was a member.

Defendant employer cannot now be heard to say that the terms of the contract are onerous. The courts have said of such a contention: " This excuse for the non-performance of a contract has within the last few years been frequently presented to the courts, but has never been accepted. Unless the parties have stipulated, in terms, for relief because of changed conditions, they must perform their contract as it is written."

Defendant cannot now repudiate the agreement on the ground that it is contrary to section 7-a. The agreement does not violate section 7-a. It avails itself of it, and illustrates its value in settling industrial rights. It was not enacted to, and does not restrict the right of employer and employee to peaceably settle labor disputes. If it was so intended it would have illegally and unwarrantably restricted the right of employers and employees to contract, and it cannot now be invoked to impair the obligation of a contract it did not prohibit. The contract was made between the employer and the only union that amounted to or now amounts to anything in

the toy business in this area. No other employees appeared before or after the contract to protest or dispute the right of both employer and employee to make the agreement embodied in the comprehensive finding which Dr. Stone made after the most patient and thorough investigations, which these interested often attended far into the night.

The quotations of expressions of opinion from the officials of the National Recovery Act, however much respect their ability may entitle them to, do not cover a case exactly like this. They applied to other situations and at best are but *obiter dicta* (not of courts, but of certain administration officials). But even if the cases wherein they expressed their views were the same, this court could not follow them unless it agreed with their conclusions. Neither can this court follow the expression of an opinion by another respected court which is quoted by defendant's counsel. *First*, because the case in which it was entered is not yet finished, and it may be that it will not be the final opinion of the court at the end of the case, and *second*, because this court, with every deference, is unable to agree with it.

Defendant's memorandum admits at page 2 that the agreement sought to be enforced here " was valid prior to the National Recovery Act, and that its validity was recognized and sustained by the various courts of this State." " It is contended, however," defendant's counsel adds, " that the National Recovery Act has made such a contract illegal (by prohibiting it), and since the agreement sought to be enforced in this action was entered into after the N. R. A. was passed, it cannot be enforced because its terms are in direct conflict with section 7-a."

The following cases, decided before the passage of the National Industrial Recovery Act, sustain the view that the agreement is valid. One of the first cases was that of *Schlesinger* v. *Quinto* (201 App. Div. 487, First Dept. [1922]), where the court said (at p. 500): " When the employee, instead of resorting to force to secure his rights, an archaic method abandoned by civilized men, seeks redress in the tribunal constituted by the government to protect its citizens in their rights and redress their wrongs, it is the duty of the court to stop all individual attempts to take the law into their own hands, and compel both parties to await an orderly judicial determination of the controversy."

Later in the same department in the case of *Goldman* v. *Cohen* (222 App. Div. 631, [1928]) Mr. Justice FINCH said: " The making of the contract being conceded and upon this record the same subsisting in full force and effect, the plaintiffs are entitled, pending the trial of the action, to injunctive relief for the protection of such of

their rights as are threatened and the violation of which will produce irreparable damage." It then pointed out, after quoting from the *Quinto* case in respect to the inadequacy of the plaintiff's remedy at law (p. 633), that " If the union has not the right to invoke the aid of a court of equity to prevent the unlawful violation of a contract such as exists in the case at bar, then such a contract loses most of its force and the rights of collective bargaining are narrowed, and the economic benefits to the community from collective bargaining to a great extent lost."

The court said in *Ribner* v. *Racso Butter & Egg Co., Inc.* (135 Misc. 616, 621, Sup. Ct. [1929]), in enjoining defendant employer from breaching its contract to employ only union labor: " I am of the opinion that equity affords the only adequate remedy in the premises." To the same effect was the case of *Suttin* v. *Unity Button Works Co.*, where Mr. Justice SCHMUCK said (144 Misc. 784, [1932]): " Under these circumstances, it is evident that the injury is not only continuous, but irreparable, for not only do the members of the union lose the opportunity to labor for profit, but the union loses in prestige and trade unionism in its attractiveness, an injury incapable of compensation. As presented, the problem calls for immediate action, for injunctive relief will be of little avail if it must abide the trial. By that time the contract will have expired and the question become purely academic. The plaintiff, showing *prima facie* a breach of contract, with continuous loss from day to day, resulting in irreparable harm, is, in view of modern jurisprudence, entitled to an injunction *pendente lite.*" (See, also, *Schlesinger* v. *Stein*, N. Y. L. J. May 15, 1933, where Mr. Justice FRANKENTHALER enjoined defendant from " purchasing * * * garments from non-union shops," etc.; see, also, *Schlesinger* v. *Finkenberg*, where Mr. Justice VALENTE in a trenchant opinion on June 10, 1931, N. Y. L. J., granted an injunction; also *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260.)

In the case of *United Shoe Machinery Corp.* v. *Fitzgerald* (237 Mass. 537; 130 N. E. 86) it was held that " an individual contract of employment entered into by an employer with his employee for the term of one year, with provision for an extension for another year, whereby the employee agrees to work for the employer to the best of his skill and ability and in accordance with factory regulations during regular working hours and the employer agrees to pay him a stated rate per hour or the prevailing piece rate, is valid and may be required by the employer as a condition precedent to employment."

In *Hoban* v. *Dempsey* (217 Mass. 166; 104 N. E. 717) it was held: " A contract between the members of a labor union of longshoremen

and the representatives of certain steamship companies, by which it is agreed that all longshoremen employed by the steamship companies shall be members of that union whenever such men are available and that, whenever such men are not available, men not members of that union may be employed, if entered into freely and fairly for the mutual benefit of the contracting parties without any intention of injuring other longshoremen or of coercing them into joining the union, is valid, and its performance will not be enjoined in a suit in equity brought by longshoremen in the same port who are not members of that union."

In *Tracey* v. *Osborne* (226 Mass. 25; 114 N. E. 959) it was held that " a suit in equity may be maintained by the members of the labor union \* \* \* against the members of another unincorporated union to enjoin the defendants from taking any action to cause or intended to cause the breaking of such agreements."

There are no decisions since the passage of the National Industrial Recovery Act that are in any wise different from those made before its passage, and there is nothing in the act itself that forbids the application to the case now before the court of the principles enunciated in these cases before its passage.

In *People's Pharmacies, Inc.* (decision No. 199, May 23, 1934), where the employer and the union about to make an agreement were unable to agree on terms, a number of provisions were submitted to the National Labor Board for its decisions. One of the provisions which the board drafted as a term of the contract reads as follows: " The employer agrees not to hire any Registered Pharmacist or Assistant not in good standing with the Association or not a member of the Association, except if the Association is unable to supply the employer with the character of help he desires." etc.

But even if the New York cases quoted had never been decided, the opinion of Mr. Justice ROSENMAN\* granting the application of plaintiff for a temporary injunction in this case so thoroughly covers the question that this court finds itself in full agreement with it. In deciding that there should be a preliminary injunction he held that the contract in this case is " similar to countless others used in industrial disputes." " The agreement in so far as it provides for a closed shop does not violate the law as a monopoly." The agreement " does not violate section 7-a of the National Recovery Act. The act was never intended to take away the rights of labor." It was enacted to strengthen the arm of labor in collective bargaining with capital. " The language of the act, section 7-a, by its very language as well as by its clear implication is not applicable." " There is no situation here of a rival union." " The closed shop was upheld as legal before the National Recovery Act.

---

\* 152 Misc. 761.

Surely Congress had no intention of declaring it illegal in 1933 when the act was passed and it did not so declare it."

Having (as far as this court can) decided the question of constitutionality of the statute, it merely remains to add that the court does not believe that the finding of Dr. Stone and the contract it embodies or the performance of it violates any part of section 7-a of the National Industrial Recovery Act.

In section 7-a we have reached the rubicon of industrial relations. If section 7-a is sustained, better relations between employer and employee may go forward. If it is nullified, that progress may be temporarily halted. If it is to be used as a fort, behind which either side may retire every time a situation arises not entirely to its liking, its passage instead of being a benefit will be a detriment to the rights of everybody. In interpreting it, therefore, great care must be taken to consider the evils at the time it was intended to remedy, and whether the remedy is constitutional. It is no part of the duty of this court to say whether the act is or is not perfect. But the court knows of no more courageous piece of legislation ever adopted or more appropriate to such a pressing emergency.

If employers after all the laborious investigation by an impartial arbitrator can violate their agreement and his findings on the ground that the agreement is in violation of section 7-a of the National Recovery Act, then the unions could likewise break their solemn contract. This would cause a chaos of uncertainty which would result in great damage, not only to employers and employees but to the whole public. It would be a throw-back to the lawless days which it was the prime object of the National Industrial Recovery Act to abolish, and it is unthinkable that the Congress which passed the act had any such idea.

Decision is reserved on plaintiff's motion to dismiss the defenses of defendants.

Now it may be that plaintiffs and defendant may, as indicated by the testimony of Mr. Freundlich (quoted on pages 739 and 740 of this memorandum), get together upon enough of the points of difference to make unnecessary further consideration by this court of the contentions between them. The court sincerely hopes that the parties may get together, as appeared possible. If they cannot do so within one week from date the court at that time will take up the second memoranda already submitted by counsel and decide whether or not the contract between the parties has been violated by defendant and, if so, to what extent and what the remedy shall be.