SAM FARULLA, as President of DOLL AND TOY MAKERS' UNION, an Unincorporated Association Consisting of More Than Seven Members, Plaintiff, v. RALPH A. FREUNDLICH, INC., Defendant.

Supreme Court, New York County, January 6, 1935.

*Emil Schlesinger*, for the plaintiff.

*Lind, Shlivek, Marks & Brin* [*Max Shlivek* of counsel], for the defendant.

BLACK, J. The main contentions of the parties to this case were set out in the opinion handed down on December 1, 1934 (153 Misc. 738). In that opinion the court held that there was nothing in section 7-a of the National Industrial Recovery Act (U. S. Code, tit. 15, § 707, subsection [a]) that prevented the making or carrying out of the award for a closed shop rendered under the agreement entered into with the New York Regional Board. This award and the contract it embodies plaintiff here seeks to enforce. This " agreement " sets out that the " form of arbitration should be determined by the Regional Labor Board " and was " accepted by the signatories of this agreement." " All parties hereby agree to abide by such arbitration, and the decision of the arbitration shall be binding upon the successors and assigns." This " agreement " was signed by plaintiffs and by Ralph A. Freundlich, Inc., Ralph A. Freundlich, president. It was also signed by the Doll Manufacturers Association of New York, by Max Shlivek, attorney. Mr. Shlivek is attorney for defendant herein. In the decision above referred to the court gave the parties one week within which to compose their differences. If there was no composition within one week the court stated that it would proceed to decide whether the defendant had violated the contract. It appeared from the testimony of Mr. Freundlich, the president of defendant, that his company would still reemploy certain members of plaintiff if the

court should decide that the contract for a closed shop did not violate section 7-a (*supra*). Just before the expiration of one week from this court's decision that an agreement for a closed shop did not violate section 7-a (*supra*) a meeting was held which was attended by representatives of the plaintiff and by Mr. Freundlich and Mr. Shlivek, attorney for defendant, but no agreement was reached at this meeting, and there has been no subsequent meeting of the parties. This court, therefore, proceeds to consider whether the contract was violated or not and to give judgment accordingly.

Defendant conducted an intrastate and an interstate business in making dolls and toys and selling them. It had showrooms and offices at No. 200 Fifth avenue, New York.

Until the violations complained of, defendant had its factory to make dolls at No. 807 Broadway. Defendant's industry is seasonal.

On June 16, 1933, the National Industrial Recovery Act became a law.

In August, 1933, plaintiff declared a general strike, which became effective in defendant's plant, but the labor mediation committee of the NRA settled the strike about September 29, 1933, after a temporary agreement between plaintiff union and an association of employers in the greater city of New York. This temporary agreement provided for an immediate wage increase of ten per cent in all classifications of factory labor in the doll business, for a forty-hour week, the diminution of home work, abolition of contracting and subcontracting, etc. The agreement provided that if the workers returned to work October 2, 1933, the employers would before January 1, 1934, enter into a complete collective agreement which would give full recognition to plaintiff union and would contain provisions the parties had agreed on. The other controverted matters were to be determined by a board of mediation.

Pursuant to this understanding, the parties entered into an agreement October 28, 1933. It set out the rate of wages to be paid workers according to craft, that thirty-six hours' work should constitute the working week, provided for the employment of none except members of plaintiff in good standing, for the abolition of subcontracting and homework, for no strikes or lockouts during the contract, for an adjustment board and impartial machinery for settling disputes. It was signed by Freundlich, defendant's president, as president of the Doll Manufacturers' Association of New York, of which defendant was a member. On November 4, 1933, a code was approved by the president for the toy and playthings industry. That code was filed in the State of New York on February 24, 1934.

The agreement of October 28, 1933, was not to become effective unless the Regal Doll Company of Trenton, N. J., signed a similar

agreement. This condition was not in the September 29, 1933, agreement, but it was put in the agreement of October twenty-eighth at the instance of Mr. Freundlich, president of defendant, and others. The Regal Company did not agree to come into the agreement and the Doll Manufacturers' Association of New York declared the October 28, 1933, agreement null and void.

Plaintiffs then notified employers that there would be a general strike. The employers, who were producing for the annual Doll and Toy Fair, then sought the intervention of the New York Regional Labor Board to prevent the threatened strike. There was a meeting at the office of the Regional Labor Board February 29, 1934. The employers agreed to submit the union's demands to arbitration. The meeting was then adjourned to March 1, 1934, to endeavor to get the Regal Doll Company of Trenton to become a party to the arbitration. The Regal Doll Company did join the arbitration, as did other doll makers who were not members of the Doll Manufacturers' Association of New York, of which defendant was and is a member.

There was a full and complete meeting of the minds of the parties. They agreed that the form of the arbitration should be determined by the Regional Board. It reads as follows: " An agreement is entered into with the New York Regional Board by the signatories hereto, to submit the following matters to arbitration: 1. Rates of wages. 2. Hours of work. 3. Conditions of discharge and employment. 4. All other conditions of work. 5. Any other point of dispute between all parties involved.

" The form of arbitration shall be determined by the Regional Labor Board, and is hereby accepted by the signatories."

The consideration for the employers' agreement to enter a binding contract with the union through the arbitrator appointed by the New York Regional Board was the calling off of the strike by the employees. As already stated the union faithfully carried out the agreement to call off the strike.

There is no doubt of the Regional Labor Board's authority to act as they did in this matter. But if any similar body had been selected to arbitrate or mediate as above agreed, they would have had the right to make just such a finding, which would have bound both parties under both the National Industrial Recovery Act and the so-called Schackno Act in this State (Laws of 1933, chap. 781).

Dr. N. I. Stone, an economist of reputation and ability, was selected as sole arbitrator. There were long hearings before Dr. Stone. It developed that the abrogated agreement of October 28, 1933, contained some provisions which were satisfactory to both sides. On some of these all parties agreed, and they were incorpo-

rated in the final decision. One of these *agreed* provisions was for *a closed shop, the abolition of subcontracting and home work, the reduction in the number of shifts to two, the outlawing of strikes and lockouts during the agreement, and for the establishment of machinery to adjust disputes.* In March, 1934, the arbitrator rendered intermediate decisions as to hours and wages. The parties were unable to agree on hours, wages, the right of reorganization, and the time the contract should run. Hearings lasted, with some interruptions, from March 15 to April 22, 1934. And there were informal conferences with the attorneys of the association and the union until May 24, 1934.

In order to permit orders to be taken at the annual toy fair in April as already stated, an intermediate decision was rendered on monthly wages March 19, 1934. A supplementary decision was rendered on April nineteenth on wages and both these are in article VI of the " agreement which is part of this decision." The weekly rates given in the decisions of March nineteenth and April nineteenth in article VI are the basis for the piece rates which are established for each plant by agreement between owners and the union. After several conferences between both the attorneys for the association and the union, the arbitrator acting as mediator, a mutual agreement was reached on all articles except 24 and 26, which were incorporated into the agreement. As Dr. Stone says. " In view of the very important concession made by the union * * * which will result in substantial savings in costs to the employer and * * * the fact that the industry is allowed to use the piece work system," the arbitrator refused to find that the employer had the right to dismiss workers in his sole discretion (in a peak season also) not to exceed ten per cent of all workers, but instead Dr. Stone found that the employer had the right to reorganize his shop " in case of a change in the character of his business."

A discussion of article 26 is not germane to this decision.

Under the agreement there was to be no home work. The agreement between the Doll Manufacturers' Association of New York, of which defendant is a member, and the plaintiff union, of May 25, 1934, provided that: " Whereas the parties hereto desire to cooperate in establishing conditions in the industry which will tend to secure to the workers a living wage and provide methods for a fair and peaceable adjustment of all disputes which may arise between the parties hereto, Now, therefore, the parties hereto agree as follows: *First.* The Association and the Union each on behalf of its members, obligate themselves in good faith to observe and perform all the provisions of this agreement. *Second.* The Association agrees that its members will employ only good standing members of the Union who carry the working cards issued by the Secretary

of the Union. In the event, however, that the Union is unable to furnish workers when called upon to do so by the members of the Association, such members may employ members in the open market provided that the workers so employed shall obtain temporary working cards from the Secretary of the Union at the end of the second working day after working not over sixteen (16) hours of such days, and the members of the Association shall report to the Union at the end of the first and second days, respectively, the names and addresses of all employees so employed. In the event that the members of the Union are in arrears in the payment of dues and assessments and notice thereof in writing has been served upon their employer, then the employer or the Association will at the request of the Union deduct from the salary of such employee or employees such arrears and will turn the same over to the Union. There shall be no financial liability on the part of the employer for such moneys unless actually collected from the employee. *Third.* It is further agreed by and between the parties to this agreement that the Union shall not deal with or settle with any manufacturer who is not a member of the Association, or if said manufacturer is not a member of the Association, then before the Union shall deal or settle with him, the Union shall require said manufacturer to deposit a cash security with the Union for the faithful performance of their contract with the Union. * * * *Fifth.* Commencing with the date hereof, a week's work shall consist of forty (40) hours in five working days with not more than eight hours in one day. During the months of September, October, November and December, overtime shall be permitted not to exceed eight hours per week and such work may at the option of the member of the Association be performed on Saturdays and such overtime shall be compensated for at the rate of time and one-half. There shall be no more than two shifts in any one day. It is understood that during this period of which overtime may be worked that the total number of hours of overtime for this entire period shall not exceed ninety-six hours. It is agreed, by and between the parties, that if on account of inclement weather, employees are unable to perform their duties in the regular course of their employment, such loss of time may be made up at the usual rate of pay, but if such loss of time is three (3) days or longer in any one week, employees may be required to work on Saturday of such week at straight time. *Sixth.* Effective at and commencing with March 19, 1934, and during the term of this agreement, the following employees shall receive not less than the following wages or rate of pay respectively: * * * Schedule A. Wage Scale. Week Work Operations: Composition men, $30; cutters, $36; second cutter, $24; stretchers, $18; head paster (minimum for week

worker), $18; pinner (minimum for week worker), $16; examiners and finishers, $14; cleaners, $14; packers and wrappers, $14; helper, $14; general help, $13.20. Piece Work Operations; Presser, $38; gluer, $25; grinder, $30; second grinder, $20; buffer, $20; patcher and polisher (men), $30; sandpaperer — on high grade dolls, $24; sandpaperer — on low grade dolls, $18; sprayer, $38; second sprayer, $26; third sprayer, $20; painter, $40; second painter, $26; third painter, $20; dip-maker, dipper, $35; dipper (heads), $25; dipper — second class (arms, legs and bodies), $18; doll dresser, $14; iron presser, $14; stuffer, $30; machine stuffer, $18; joiner and tier on stuffed dolls, $24; second joiner and tier on stuffed dolls, $18; joiner on composition dolls, $18. With respect to the determination of piece rates for rubber dolls, unless such rates are agreed upon before June 15, they shall be submitted to arbitration. *Seventh.* Employees other than apprentices who have been employed by a member of the Association for a period in excess of two (2) weeks may not be discharged except for good cause. In the adjustment of disputes between the parties hereto, complaints of improper discharge of workers shall have precedence over all other causes and such complaints, in the event of a failure of the Adjustment Board to agree or failure to meet within forty-eight (48) hours after such discharge of employees, shall be submitted to the arbitrator who shall render his decision within forty-eight (48) hours after such submission. Should such decision be that a worker was unjustly discharged, he shall be compensated for loss of time. *Eighth.* The workers in each factory shall designate a shop chairman and a shop price committee, which chairman and price committee shall meet with the employer or his representative and a union official to fix all rates for piece work and in the first instance to consider all disputes and grievances. In the event that the employer and the shop committee and union official shall be unable to agree, the matter shall be referred to the Adjustment Board, and in the event that the Adjustment Board is unable to reach an accord, the dispute or grievance shall be referred to the arbitrator for final decision. Pending final determination of any dispute or misunderstanding, work must continue uninterruptedly. The arbitrator must render his decision within one week after any dispute or grievance is submitted to him. *Ninth.* During the term of this agreement, there shall be no general lock-out, general strike, individual shop lock-out, individual shop strike or shop stoppage pending the determination of any complaint or grievance. Should there be a stoppage of work or shop strike in the factory of any member of the Association, and such striking workers are not returned to their work within thirty-six (36) hours after the mailing of

a notice of such strike to the union at its last known address, the striking workers shall be deemed to have abandoned their employment. In the event that the workers are locked out, the employees shall be compensated for their loss of wages occasioned by said lock-out. * * * *Eleventh.* The Association and each member individually agree that the system of sub-contracting in the shop and home work shall immediately be abolished and that no sub-contracting in the shop or home work shall be done or performed in connection with any of the products produced by members of the Association. * * * *Twelfth.* No person under the age of sixteen years shall be employed by any member of the Association as a manufacturing or productive employee. * * * *Fifteenth.* The Union further undertakes and agrees that it will not permit any of its workers to work in shops which are not in contractual relations with the Union. The employer agrees not to buy any composition parts of dolls from or to sell any composition parts of dolls to any concern that does not conform to the wages and hours set forth in this agreement and each individual employer agrees that he will not buy from or sell to any concern working under non-union conditions any composition parts of dolls. *Sixteenth.* All complaints, disputes or grievances arising between the parties hereto, involving question of interpretation or application of any clause of this agreement or any acts, conduct or relations between the parties hereto or their respective members, directly or indirectly, shall be submitted to the other party hereto and a committee to be known as the Adjustment Board, consisting of three members of the Association and three members of the Union shall in the first instance jointly investigate such complaints, grievances and disputes and attempt an adjustment. Decisions reached by the Adjustment Board shall be binding on the parties hereto. Should they fail to agree, the question or dispute shall be referred to a permanent arbitrator and his decision shall be final and binding upon the parties hereto. In the event of a substantial violation of any of the terms, covenants and conditions of this agreement on the part of the Union, the Association and/or any member shall have the option to terminate this agreement. The existence or non-existence of such substantial violation shall be determined by the arbitrator on all the facts and circumstances. In the event that the Union shall refuse to carry out a decision of the impartial chairman on the question of a substantial violation of this agreement, then this agreement shall be terminated at the option of the Association and/or any individual member thereof. In the event of a substantial violation of any of the terms, covenants and conditions of this agreement on the part of the Association, and/or any member thereof, the Union shall

have the option to terminate this agreement. The existence or non-existence of such substantial violation shall be determined by the arbitrator on all the facts and circumstances. In the event of a refusal of the Association and/or any individual member to carry out a decision of the impartial chairman, the Union shall have the option to terminate this agreement. *Seventeenth.* No employee shall be discriminated against on account of Union activity. *Eighteenth.* The parties hereto shall within ten (10) days after the execution of this agreement, jointly agree upon and designate an arbitrator. * * * *Twentieth.* Notwithstanding the resignation of any member of the Association or the removal of any member of his factory to any other place outside of New York City, the obligation of this agreement shall remain in full force and effect and shall be binding upon each member. * * * *Twenty-second.* Thirty (30) days before the expiration of this agreement, the parties hereto shall confer on the terms to be set forth for the renewal and extension or modification of this agreement for the ensuing year. * * * *Twenty-fifth.* The signatories to this agreement may at all reasonable times examine each other's books, documents or records for the purpose of determining whether or not manufacturers are paying the rates of wage and working the number of hours provided for in this agreement. * * * If no notice is given by February 1, 1935, by either party to the other as to any changes or modification desired, this agreement is automatically to continue and remain in force for another year from June 1, 1935."

The Code of Fair Competition for the Toy and Playthings Industry provides for not less than twelve dollars per week for forty hours work (except that learners for a six weeks' period shall receive eighty per cent of this minimum per week for forty hours' labor), and the number of apprentices is limited to ten per cent of the whole number of employees; for a tolerance period of overtime of ninety-six hours a year, provided that no employee should work more than forty-eight hours in any one week; for paying time and a third for overtime. The code prohibits work in excess of the number of hours prescribed in the code and forbids home work.

After Dr. Stone's decision, defendant entered into partial performance of the terms of it. During the trial, in answer to a question of the court, Mr. Shlivek, attorney for defendant, said: " If your Honor means to inquire whether the defendant did comply in part with his agreement I will say that he (it) did."

One of the respects in which defendant partly performed the agreement was that " back pay " (under the arbitrator's decision relating to the decisions back to March 1, 1934) was refunded to some of the workers. (Plaintiff's Exhibits 23a, 23b, 23c, 24 and 24a,

being papers from defendant's payroll book in the city of New York.) Defendant still claims that it has performed the other conditions of the agreement.

The plaintiff made fruitless attempts to set up the adjustment board provided for in the agreement and selected its representative. The association of which defendant was a member never selected one. Plaintiffs finally wrote Mr. Shlivek that it wanted to go before the arbitration board provided for in the collective agreement, which was part of the decision of May 25, 1934.

Esposito had attempted to see Mr. Freundlich during June, 1934, to discuss matters. He was unable to see him. He then attempted through an intermediary to see Mr. Schlivek to talk about an adjustment board. At the time arranged Mr. Esposito was there but Mr. Schlivek was not.

At the suggestion of Ben Golden, executive secretary of Regional Labor Board, plaintiff made complaint against defendant in writing July 5, 1934. Although notified, defendant failed to appear on the day set. On July eleventh Mr. Schlivek appeared and stated he had authority to act for defendant. He admitted that defendant was going to move to Clinton, Mass. Mr. Schlivek offered to give plaintiff's accountants access to defendant's books, but this was never done because Mr. Freundlich would not permit it. On November ninth Mr. Freundlich was asked by counsel for the plaintiff: " Q. Mr. Freundlich, do you agree on behalf of the defendant to employ in Clinton, Massachusetts, in strict conformity with the agreement of May 25, 1934, each and every worker heretofore employed in the defendant's factory in New York who may apply for work either at the defendant's offices in 200 Fifth Avenue, New York City, or at the defendant's factory in Clinton, Massachusetts?" to which he answered " I will."

Counsel for the plaintiff states that on the fourteenth of November he asked Mr. Freundlich whether he would speak to some workers then in court to arrange for their employment, and that Mr. Freundlich answered that he would see them at his office, 200 Fifth avenue, Thursday afternoon, November fifteenth, at five o'clock, and that a committee of thirty workers appeared there at that time but the committee was informed that Mr. Freundlich was not in town and not expected until Tuesday, the twentieth; that on the sixteenth of November plaintiff's counsel tried to reach Mr. Shlivek, defendant's counsel, by telephone, but was informed that he was not expected to return to the city until Monday, the nineteenth of November, and that on the sixteenth of November plaintiff's counsel sent a telegram to the defendant at Clinton, Mass., that thirty workers were ready to commence work in the factory at Clinton on Monday,

the nineteenth, but that on the seventeenth of November there had been no reply to this telegram; that on the seventeenth of November fifteen additional workers called at the office of the defendant in New York for employment at Clinton, and that these workers were told to come back next week, that is the week beginning Monday, the twenty-sixth of November.

On Monday the court received a letter from Mr. Schlesinger, plaintiff's counsel, stating that counsel was thoroughly convinced that Mr. Freundlich offered to engage the New York men for Clinton in the best faith and that he would communicate with Mr. Freundlich immediately. On November twenty-sixth Mr. Schlesinger, attorney for the plaintiff, wrote the court that Mr. Esposito, the manager of the union, finally saw Mr. Freundlich, who took a list of his former employees who wished to work in Clinton; he said he would require a few days to think it over. Mr. Freundlich asked Mr. Esposito to call again on Friday, the nineteenth. Mr. Esposito called but was advised that Mr. Freundlich would not return until Tuesday, the twentieth. Finally a conference between the attorneys for the parties was held at the chambers of the court on Thursday, December tenth, at which Mr. Shlivek stated that he had been engaged in one or two different courts and that his office had not promptly called his attention to the letters of Mr. Schlesinger. It soon became apparent to the court that nothing would be done.

Freundlich swore that he would ask workers to join the union and would employ nobody at Clinton, Mass., unless they are members of the plaintiff union. He was asked, assuming that the agreement was legal, if he was willing to abide by the second paragraph relative to the closed shop.

The contention of defendant is that the agreement between the Regional Labor Board, where all parties went for succor, and the Doll Manufacturers Association, of which defendant was the most important member, and defendant, signing by its president, who had been president of the Doll Manufacturers Association, and Dr. Stone, the arbitrator, was not a contract but was an agreement to make a contract. This is the most unique argument ever presented to this court. Of course it was a solemn contract presumably entered into in good faith by every party to it. But if it is only an agreement to make a contract, it was an agreement to make a finished contract where every term and provision had been considered, fought over, and agreed upon, by both sides, or decided by their agent, an officer of the United States, to whom had been delegated in the most sacred manner the decision of issues that were disturbing the doll industry. So that if defendant's contentions were right, that it was merely an agreement to contract, the court

could at once decree the signing of a contract where everything had been decided. The only result of such a contention by defendant would be to postpone still further a settlement presumably entered into by it to prevent delay in settlement.

The legal propositions are too obvious to enunciate, but in addition to this there is not one moral argument that can be urged to sustain defendant's contention that it is not a contract but an agreement to make a contract. Defendant contends that this contract cannot now be enforced against defendant, whose association refused to appoint the board of adjustment called for by the decision of Dr. Stone and which has reaped all the benefits of settling a threatened strike. Defendant has moved to a distant State where it paid a nominal rent, but (even with this saving) has failed to carry out the terms of its binding engagement for collective bargaining under section 7-a of the National Industrial Recovery Act. The situation is just as if after all the proceedings by delegates to the crime conference at Washington the other day, where delegates came with credentials from every quarter, some man, after the conference accomplishes great good and adjourns, should arise and say the resolutions adopted and the measures agreed on were not authorized by the organizations that gave the credentials to the delegates, and what they did was only to agree to do what they did.

Dr. Stone, the arbitrator, was delegated to act for both, and in so acting was the agent for both. That an arbitrator is an agent of both parties was recognized in *Hays* v. *Hays* (23 Wend. 363), where the court said (at p. 367): " Arbitrators are agents of both parties. Hence their acts can be considered as the acts of the parties themselves; and a balance found by the arbitrators is considered as a balance struck by the parties on an account stated by themselves."

Professor Williston, in his book on Contracts, says: " Conceivably the agent may sign either his principal's name without mentioning his own; he may sign his principal's name stating that the signature of the principal is made by him as agent; he may sign his own name as agent for a specified principal; he may sign his own name as agent, but without mentioning for whom; or, finally, he may sign his own name without mentioning any agency." (Williston on Contracts, § 587, p. 1136.)

To the same effect see Restatement of Contracts (Vol. 1, § 213, subd. 2), which states the rule as follows: " The same third person may be the agent of both parties to a contract within the Statute for the purpose of signing a memorandum."

The Restatement of the Law of Contracts (§§ 445, 550, 551) sets forth the rule in comment as under section 550 as follows:

" A bargain to arbitrate, though it is not illegal, is practically unenforceable unless arbitration is named a condition. The authority of the arbitrator is revocable by either at any time before an award is made, and although the revocation is a violation of the agreement, the injured party is without substantial redress. If, however, the bargain to arbitrate is carried out and an award made, the award is binding." However limited the effect of such a bargain may be, if (1) the authority of the arbitrators is not revoked before they make an award, and (2) they conform to the authority given them, and (3) the award is not invalidated by fraud or bias of an arbitrator, by failure to give a fair hearing to the parties, or by a basic mistake indicating a failure of the arbitrators to exercise their judgment on the proved facts, then the bargain is enforceable. (§ 445.)

This is a common-law arbitration in which no legal obligation existed prior to the actual arbitration.

Chief Judge CARDOZO, at page 302 (*Matter of Marchant* v. *Mead-Morris Mfg. Co.*, 252 N. Y. 284) stated the rule thus: " Under the rule at common law as established in this State, it was not a bar or defense to a remedy in the courts that the action was maintained in breach of a contract for the settlement of future differences by recourse to arbitration (*Pres., etc., of D. & H. Canal Co.* v. *Penn. Coal Co.*, 50 N. Y. 250; *United States Asphalt Ref. Co.* v. *Trinidad Co.*, 222 Fed. Rep. 1006)."

In *President, etc., D. & H. Canal Co.* v. *Penn. Coal Co.* (50 N. Y. 250, 266) the Court of Appeals distinguished arbitration as follows: " The distinction between the two classes of cases is marked and well defined. In one class the parties undertake by an independent covenant or agreement to provide for an adjustment and settlement of all disputes and differences by arbitration, to the exclusion of the courts, and in the other they merely, by the same agreement which creates the liability and gives the right, qualify the right by providing that before a right of action shall accrue certain facts shall be determined or amounts and values ascertained, and this is made a condition precedent either in terms or by necessary implication."

In *Fidelity & Deposit Co. of Maryland* v. *Woltz* (253 N. Y. Supp. 583) the court distinguished a common-law arbitration as a contractual and not as a judicial proceeding which results not in a judgment but in a cause of action against the defaulting party. The *per curiam* decision reads as follows: " This was an attempted common-law arbitration which is a contractual, not a judicial, proceeding, and if properly conducted, results, not in a judgment, but in a cause of action against the party who does not obey the award."

Courts are loathe to characterize the conduct of litigants, but when they get all the benefits they are after and succeed in preventing strikes until the employment crisis is practically over, and when as in this case they even agree that they will still carry out the agreement for a closed shop (if the court says the NIRA does not forbid it), and when within the week the court allowed the parties for such purpose plaintiffs found it impossible after every reasonable effort to even make an engagement with defendant until a day or so before the time the court allowed for composing the differences, then the conduct of defendant can only be characterized as welching, and the court can only consider defendant's action as that of a party who got all the benefits but refuses to carry out the obligations. The court will not say what the defendant's intention was in going to Clinton, Mass. It makes no difference what it was. It may have gone there to evade its contract, and yet when it got there it might have decided to carry it out. On the other hand, it may have gone there with the holiest intentions of performing the agreement it had so solemnly entered into, and after going there it may have yielded to the temptation of hiring 600 or 700 unskilled non-union men for cheaper wages instead of rehiring the union men it had agreed in New York it would hire, whether the plant] was moved from New York or not. One side or the other, or both, had that very thing in view when the contract was entered into. Here is the language: " Notwithstanding the resignation of any member of the Association or the removal of any member of his factory to any other place outside of New York City, the obligation of this agreement shall remain in full force and effect and shall be binding upon each member."

I am reviewing the facts presented on the trial which concern the violations of the collective agreement by the defendant, and under which agreement it was bound. The credible evidence on the trial established that the defendant breached, violated and abrogated the terms and provisions of the agreement. It failed and refused to pay its workers employed in its factory in the city of New York the minimum wages provided for in the contract by placing upon the workers in its factory in New York city additional duties not contemplated in the wage scale set forth in the agreement, thereby making it impossible for workers of average ability to earn the minimum wages; by sending out to workers' homes materials to be manufactured by them into dolls' dresses and other accessories; by sending out goods to be manufactured into dolls' dresses to two non-union contractors in New Jersey; by locking out all of its workers, members of plaintiff union, employed in its factory in the city of New York, except some thirty, and by failing to co-operate

in the establishment of an adjustment board for the settlement of complaints and disputes which arose between the plaintiff union and the defendant. I find as a fact that since the date when the defendant started operation of its factory in Clinton, Mass., it violated and breached the agreement by failing to maintain a union shop and refusing to employ only members in good standing of the plaintiff union; by failing to maintain and refusing to adhere to the minimum wage and the maximum hour provision contained in the collective agreement; by failing to pay time and one-half for overtime; by requiring workers to work more than two shifts a day; by failing and refusing to mark on the pay envelopes of each employee the amount due him or her; by employing more than ten per centum of its total number of employees as apprentices, and by transferring workers at the end of their apprenticeship period in one department to another department in its factory, where they were obliged to begin their apprenticeship over again at apprentice's wages. The fifth paragraph of the contract provides in effect that a week's work shall consist of forty hours in five working days, with not more than eight hours in any one day. During the months of September to December, inclusive, overtime is permitted but may not exceed eight hours per week. Overtime must be paid at the rate of time and one-half. In the sixth paragraph the wage scale is set forth for each operation and for each craft. Under this wage scale the various crafts engaged in the manufacture of dolls are classified as (a) week workers; (b) piece workers. Week workers are those who are paid a fixed weekly wage for forty hours of work irrespective of the amount of production of each worker. Piece workers are those who are paid for each piece which they produce, and are not paid a fixed weekly wage. Their weekly earnings depend entirely upon their productivity. The wages set forth in the agreement for piece workers are those for workers of average skill. Paragraph eighth of the agreement provides the method for settling piece rates for each operation.

All witnesses testified that in settling piece rates a worker of average skill in each department was selected as a test hand. Based upon his production the average wage of all the other workers in the particular craft was arrived at. A worker who was more efficient was to receive more than the wages provided for in the agreement for a worker of average skill. A worker who was less competent might receive less than the minimum without the agreement being violated.

The witnesses Sorok, Caniglia and Cantarella, who testified upon behalf of the plaintiff, stated that the defendant violated the agree-

ment by paying them wages far below the minimum. Stephen Sorok testified that he was a dipper and as such he was to receive eighteen dollars per week for forty hours' work; that he did not receive that amount; at first he received twelve dollars per week for forty hours' work; later he received fourteen dollars per week for forty hours' work and that at the end of June, 1934, just before his employment terminated, his wages had been increased to fifteen dollars per week. The testimony of this witness was corroborated by the defendant's payroll book which indicated that neither Sorok nor other dippers received the minimum wage of eighteen dollars per week. The witness Caniglia, who I believe was conceded by defendant to be one of its most skilled pressmen, never received thirty-eight dollars per week and was never paid at the rate of ninety-five cents an hour. With reference to the hours of labor, Sorok testified that he worked far in excess of forty hours per week during the months in which no overtime was permitted, and that it was not uncommon for him and others to work until ten and eleven P. M. at night. On occasions he even slept at the factory. He produced the key to defendant's factory in New York city, which he said Mr. Weiss, supervisor over foremen and other various departments in the defendant's factory, gave him to open the factory on those Saturday afternoons and Sundays when the defendant ordered many of the workers to report for work. Generally, he testified, he received his instructions by telephone or telegram to open the factory on Sundays. He also testified that not only did dippers and fleshers work on those days, but he saw others in the different departments on the same floor also at work.

The defendant did not produce any time card records of the week workers or the original production cards of the piece workers. The defendant's witnesses testified that at the end of each week the cards were figured up and the total wage due each worker was entered in the payroll book and the cards were then destroyed. The books of the defendant did not show the hours worked nor the total amount produced by each worker for each week. It seems to me that the defendant had ample notice of the importance to the workers of these time cards, on the trial of the action, because of the affidavits filed on the motion for a temporary injunction. The necessity for keeping the cards intact was plainly indicated as a means of establishing the truth or falsity of the charges made by the workers. The alleged destruction of these time cards is sufficient of itself to warrant an unfavorable inference against the defendant, that their production would tend to establish plaintiff's charges of bad faith and breach by the defendant. The cards

would have been a most essential and a necessary element in the documentary proof in the case on one of the most important phases of the case.

In *Armour* v. *Gaffey* (30 App. Div. 121; affd., 165 N. Y. 630) the court said: " The well-settled principle, therefore, applied that ' where it appears that a party has destroyed an instrument or document, the presumption arises that if it had been produced, it would have been against his interest, or in some essential particulars unfavorable to his claims under it * * *. The inference is that the purpose of the party in destroying it was fraudulent.' (' *Joannes* ' v. *Bennett*, 5 Allen, 169, 172.) "

This doctrine was reiterated in *Matter of Eno* (196 App. Div. 131, 163): " It is well settled that the deliberate destruction of written evidence gives rise to the inference that the matter destroyed or mutilated is unfavorable to the spoliator. This unfavorable presumption will not dispense with the necessity of the other party introducing some other evidence of its contents, that it may appear that the documents destroyed were in fact relevant to the case. The presumption does not arise from the mere destruction of documents. It must appear that the documents were written evidence relevant to the issues, or at least the documents should by notice be required to be produced upon the trial."

The Labor Law of Massachusetts (Chap. 149, §§ 48 and 52) reads as follows: " Sec. 48. Every employer of labor engaged in carrying on any manufacturing or mercantile establishment in the commonwealth shall allow every person, except those specified in section fifty, employed in such manufacturing or mercantile establishment, at least twenty-four consecutive hours of rest in every seven consecutive days. No employer shall operate any such manufacturing or mercantile establishment on Sunday unless he has complied with section fifty-one. Whoever violates this section shall be punished by a fine of fifty dollars. Sec. 52. Every employer subject to section forty-eight shall keep a time book, open to inspection by the department, showing the names and addresses of all employees and the hours worked by each of them in each day. Whoever violates this or the preceding section shall be punished by a fine of fifty dollars."

The evidence also established clearly the fact that defendant placed additional duties upon sprayers, which additional duties were not contemplated in the wage scale of the agreement, and in consequence sprayers of average ability were unable to earn their minimum wage.

Nini Cantarella, a sprayer employed by the defendant in its New York factory, testified that prior to March 19, 1934, the date

on which the arbitrator rendered his intermediate decision, all dolls produced by defendant contained separate units. When he sprayed the head or body of the Trixie doll — the parts of this doll are all separated — he was paid for each operation. Sometime after March 19, 1934, the defendant began manufacturing the Topsy doll (the head and body of this doll are in one piece and comprise one unit) and defendant refused to pay the price per piece for the additional work and gave to the sprayers, including the witness, only one cent more per gross for spraying the head and body as a unit than for spraying the head alone. Because of this additional labor, Cantarella, the witness, was unable to earn the minimum wage of twenty-six dollars per week. Plaintiff's Exhibit 37 fully bears out the testimony of the witness.

Paragraph eleventh of the collective agreement and article III, subdivision 7, of the Code of Fair Competition for the Toy and Playthings Industry expressly prohibits home work. Esposito, the manager of the union, testified that the defendant produced dolls' dresses in the homes of the workers. He testified that just before the defendant moved its factory he observed women going to and coming from the factory, carrying packages; that he himself saw packages being wrapped in the factory containing cut goods which were given to some of these women and that he also saw that the bundles which the women brought to the factory, upon being opened or unwrapped, contained dolls' garments. Mr. Freundlich, on cross-examination, admitted that defendant sent out goods to be manufactured into dolls' dresses to two non-union contractors in New Jersey. The plaintiff's charge that the defendant violated the terms and provisions of paragraph ninth of the collective agreement by locking out the workers whom it employed in its factory in New York city, is sustained by the evidence. The paragraph provides: " During the term of this agreement, there shall be no general lock-out, general strike, individual shop strike or shop stoppage pending the determination of any complaint or grievance."

The testimony of the members of the plaintiff union who were employed in defendant's factory in New York city show that when they heard that the defendant contemplated moving to Clinton, Mass., they requested employment in the new factory and were refused such employment. The testimony of Caniglia shows that in reply to his application for work in Clinton, the manager of defendant's factory said: " Take you and have to deal with the Union again? "

Except for the foremen of the various departments and but few of the highly skilled workers who were selected to act as instructors

or teachers to the new workers in Clinton, Mass., the defendant did not take any of its workers from New York. It is true that defendant's witnesses denied these statements, but the truth is with the plaintiff's witnesses. Furthermore the defendant violated the collective agreement by failing to assist in the establishment of an adjustment board to pass upon the union's complaints and grievances against the defendant's conduct. Paragraph sixteenth of the agreement provides for the establishment of a system to settle all complaints or disputes which might arise between the parties. This paragraph is complementary to the ninth paragraph which outlaws strikes and lockouts and sought thereby to secure peace, harmony and stability in the industry. I find as a fact, that the union made constant and repeated efforts to create an adjustment board. The proof indicates that the defendant failed and refused to co-operate to that end. The evidence satisfies me that after the defendant moved its factory, it continued to violate the agreement with the plaintiff union, as well the Code of Fair Competition for the Toy and Playthings Industry. The second paragraph of the collective agreement provided that the defendant was obligated to employ only members of the plaintiff union in good standing who carried working cards issued by the secretary of the union. It is there provided that in the event that the union is unable to furnish workers to an employer when called upon to do so, the employer could employ any workers in the open market, provided, however, that they obtained temporary working cards from the secretary of the union at the end of the second day. The witnesses of the defendant testified that only twenty-five or thirty out of the 600 or 700 workers who were employed in the Clinton factory were members of the union. It was not disputed by the defendant that it did not request any of the workers whom it employed in Clinton, Mass., to obtain temporary working cards from the secretary of the plaintiff union.

Defendant failed and refused to adhere to the minimum wage and maximum hour provisions of the agreement. Workers employed by defendant in its Clinton factory who were not members of the plaintiff union testified that they worked in excess of forty hours, and the eight hours overtime per week permitted in the months of September and October. It appeared from the testimony of Leon Poissant, Anthony Cieslik and Dominick Turini, all workers in the Clinton factory, that they worked more than forty-eight hours per week and that they were paid at the rate of single time for overtime. The Code of Fair Competition for Toy and Playthings Industry under article VI, subdivision 1 (a), provides that during the period of apprenticeship workers shall

receive nine dollars and sixty cents per week for forty hours' labor. Article III of the code provides for the number of hours which employees may work during any one week. The normal work week is forty hours. During the seasonal or peak demand, the number of hours which may be worked shall be as many as are required by the necessities of the situation, but in no case more than forty-eight in any one week or ninety-six hours of overtime in any calendar year, provided that time and one-third shall be paid for all hours per week over forty (Art. III, § 5, Code of Fair Competition). Counsel for the defendant argues that because the word " apprentice " or " learner " is not used under article III, the provisions in the code with respect to hours do not apply to such workers. I do not agree with the learned counsel for the defendant in his interpretation of the code and find as a fact, that the defendant violated the code provisions. In article II, section 2, of the code, the term " employee " is defined as follows: " The term ' employee ' as used herein includes any person engaged in any phase of the industry in any capacity receiving compensation for his services, irrespective of the method of payment of such compensation, and shall include all proprietors, partners, supervisors, and foremen when actually engaged in productive work." The words " any person " and " in any capacity " clearly indicate apprentices and/or learners.

In article III, section 1, the hours of labor for every employee are distinctly set forth. Sections 2, 3, 4 and 5 contain the exceptions to the rule. Thus, an apprentice or learner is an employee and since no exception is made in his case under sections 2, 3 and 4 of article III he comes within the exception of section 5, and during the peak of the season may work forty-eight hours provided that for every hour over forty he is paid at the rate of time and one-third.

A transcript of the defendant's payroll book furnished by James Harrington, an investigator for the National Recovery Administration in Boston, shows wages earned by the workers during the weeks ending September 22 and September 29, 1934, but does not show the number of hours each employee worked. It was not disputed and in fact conceded by the defendant witnesses that each worker in the Clinton factory had either a time card or production card, depending upon whether he or she was a week worker or a piece worker. The witnesses stated that at the end of the week the wages due each worker were arrived at from these cards and the total entered into the payroll book. No entry, however, was made in the payroll book of the number of hours worked or the number of pieces produced. These cards were destroyed after the final figures had been entered into the payroll book. The defendant

had ample notice to produce these cards. During the trial and immediately following the testimony of the workers from Clinton, Mass., the court at plaintiff's request directed the defendant to produce the cards and especially those of the witnesses who had been called to testify. The defendant insisted that the cards had been destroyed. The witness Harrington, an investigator, stated that when he visited the defendant's factory in Clinton he asked for the production of the time cards and the production records of each worker. On one occasion the factory manager, a Mr. Trepner, stated that the cards were in the New York office.

Under article III, section 5, and article VI, section 4 (a), of the Code of Fair Competition for the Toy and Playthings Industry it is provided that the Code Authority shall have the power to require and receive reports from every employer in the industry as to wages and hours of labor " showing actual hours worked by employees and minimum rate of wages." Mr. Freundlich on cross-examination admitted that he knew of this provision, but gave no satisfactory explanation why the cards and the productivity records of each of his workers were destroyed. The alleged destruction of the cards under the circumstances disclosed on the trial makes it impossible to secure the facts obtainable only from these first hand original records. My finding on the alleged destruction is that there is at least a presumption in favor of the plaintiff's case and against the defendant that had the cards been produced they would by documentary evidence have fully and completely sustained the charges made by the plaintiff of the various violations of the agreement as well as the Code. There was some significant testimony on the cross-examination of the defendant's witness Weiss, supervisor of the foremen, as follows: " Q. I show you plaintiff's exhibit 16 and ask you whether you observe the name J. Freel on there for the week ending September 22? Will you refresh your recollection as to how many hours Mr. Freel worked? A. That week he worked forty-eight hours. Q. And that was at the rate of 24c an hour? A. That would be right. Q. And he got $9.60 for the first 40 hours? A. Yes, sir. Q. And he got 24c an hour for each additional hour? A. Right. Q. Now look at the week ending September 29th for the same man, Freel, $11.64. Will you state how many hours that represents? A. That should represent 48 hours. Q. And that is 12c for that half hour? A. Yes. Q. Now I ask you to look at the name immediately above that, C. Morotti? A. Right. Q. He earned $11.52, did he not, for the week ending September 22d? A. Right. Q. And the week ending September 29th he earned $11.76? A. Right. Q. And does that show the number of hours he worked? A. No, only the

amounts. Q. How many hours does that represent? A. That should represent 49 hours. Q. 49 hours? A. That should represent that, yes."

This testimony shows that workers were paid single time for overtime. Under paragraph fifth of the Collective Agreement the rate fixed for overtime was time and one-half. Under article III, subdivision 5 of the Code of Fair Competition, the rate for overtime is fixed at time and one-third. Mr. Freundlich on cross-examination, admitted that those workers who were employed for more than six weeks — the apprenticeship period under the Code — in Clinton, Mass., did not receive the minimum wage provided for a worker of average skill under the collective agreement. The witness was interrogated by the court and he conceded that the wages paid such workers were about fifteen per cent lower than those paid in the New York factory. The figures compiled by the accountant for the plaintiff union indicated that the reduction was more than fifteen per cent. There was no evidence to warrant or justify such a reduction in the piece rates by the defendant.

Under the fifth paragraph of the collective agreement, it is provided that there shall be no more than two shifts in any one day. This provision, the evidence shows, was violated by the defendant. John Miller, a worker employed as pressman in the defendant's factory in Clinton, testified that the pressing department worked three shifts since the middle of October, 1934. He stated that when he came to work in the morning he often had to wait until the pressman who worked on the prior shift had finished his work; and that in the evening, after he had finished his work and before he went home he saw the third shift come in and that he observed a worker oiling the very machine which he had used, in preparation for the night's work.

Under the fourth paragraph of the collective agreement it is provided: " The wages of employees shall be paid on Wednesday of each week for work done in the preceding week. The amount due the employees shall be marked on the envelopes of such employees."

The witness Poissant, a worker employed in the factory in Clinton, Mass., presented six of his pay envelopes which he received from defendant. The pay envelopes were received in evidence. Five out of the six envelopes do not contain any notation thereon of the amount which was placed therein and due the witness for his work.

The defendant's witnesses testified that all of the 600 or 700 workers who were employed by the defendant in its factory in Clinton, except twenty-five or thirty who came from New York city, were engaged as apprentices.

The agreement of May 25, 1934, does not indicate or specify the number of apprentices which may be employed and the conditions under which they shall work. With respect to this the defendant on the trial sought to impress the court with the fact that the defendant could not be guilty of any violation irrespective of the conditions by which the apprentices were employed. In explanation Esposito, a witness for the plaintiff and a manager for the plaintiff union, testified that during the course of the hearings before the arbitrator the provisions in the October 28, 1933, agreement for a " learner period of three months " was discussed for a few moments only and this was due to the fact that shortly after October 28, 1933, to wit, November fourth, the Code of Fair Competition for the Toy and Playthings Industry was approved by the President of the United States, and that such Code, which was applicable to the doll industry, contained definite provisions with respect to apprentices which were satisfactory to the plaintiff and the workers of the union.

The defendant was bound by the Code provision with just as much force and effect as if the provisions had been written into the agreement. More than that, there was a penalty by law for the violation of the Code provision irrespective of whether or not the exact terms had been actually in the contract. When the Code was approved, the provisions, in so far as they related to the industry, became by implication a part and parcel of the contract. The plaintiff and/or any worker could have compelled obedience to the law by the defendant. The plaintiff union under the agreement had a right to resort to any remedies given by the statute, and it was not compelled to elect to proceed against the defendant as a breach in a court of equity or proceed under the statute. It has a right here to treat the violation as a breach of the contract without waiving any rights or remedies given by law under that statute. Though the contract contains a provision for a three months' apprenticeship period, the Code limits the period to six weeks, and neither the union, the employer nor the workers themselves may violate the provisions by either consenting to an extension of the period or by waiver of their respective rights to enforce the law, and an extension of the period of apprenticeship beyond the six weeks is a violation of the law, and so, in my view of the Code, it became a part of the contract in so far as the time was limited to six weeks and not three months. The view of the defendant that in any event it may fix the period for three months is not well taken. So that the defendant cannot secure an exemption from the operation of the Code, and in that way reduce the weekly earning of the learners and beginners during the period of apprenticeship, and this was frustrated when the

National Recovery Administration denied defendant's petition filed on June 26, 1934, by order 86-14 dated July 18, 1934, after a hearing in which the plaintiff union and others had been duly heard. The Code must be read in connection with the agreement, for the law is impliedly a part of the agreement, and where the contract is silent the Code provisions prevail.

Under the Code provisions the period of apprenticeship is limited to six weeks at a minimum of nine dollars and sixty cents for forty hours' labor, with a limitation upon the number of apprentices to ten per cent of the total number of workers in any factory. The witnesses Weiss and Trepner both testified that all of the Clinton workers were employed as apprentices at nine dollars and sixty cents per week. An excerpt of Trepner's testimony is as follows: " Q. When the Clinton workers were employed in the middle of August, what salaries were paid to them? A. $9.60."

It is apparent that this in itself was a violation of the Code which is part of the agreement by implication, since the date of the approval of the Code, as it appears that more than ten per cent of the total number of workers in the factory were employed as apprentices and received the wages of learners. I am satisfied that the defendant in order to circumvent the agreement and the Code did transfer workers at the end of the six-week period from one department to another at the same apprentice wage, and this in violation of the agreement and the Code.

The testimony of Robert Freel, a worker employed by the defendant at Clinton, and who voluntarily appeared at the trial, showed that he was not a member of the plaintiff union; that he was employed as a polisher for six weeks at nine dollars and sixty cents per week for forty hours' work, and that at the expiration of that period he was transferred to the patching department where he was employed again as an apprentice, receiving the same rate of pay.

The testimony of Anthony Cieslik, another worker employed by the defendant at Clinton, was to the same effect.

The testimony of both Mr. Weiss and Mr. Trepner on cross-examination showed that the practice of transfer was not resorted to in the New York factory and that the workers remained for years in the same department.

Article IV, section 4, of the Code of Fair Competition provides as follows: " Employers shall not reclassify employees so as to defeat the purposes of this Act."

A considerable amount of testimony was introduced to show the normal length of time which it would take workers without experience to learn the various operations in the doll industry. The witnesses for the plaintiff testified that it would take about one-

half day to learn the simplest operation and about two weeks to learn the most difficult operation; that it would take a week to acquire speed in the most difficult ones. This testimony in my opinion was clearly corroborated by work slips given to Leon Poissant by the defendant and produced at the trial. They showed that during the week of October 8 to October 13, 1934, after Poissant had been employed for five or six weeks, he was able to grind 19,650 parts in one week. The testimony of Mr. Freundlich that it would take a year to learn the simplest operation is on the proofs here improbable and incredible. It will be thus observed that the defendant has attempted by this method to violate the agreement and the law by the so-called transfers from one department to another. Such transfers are but a scheme on the part of the defendant to evade the obligations cast upon it. I find that the plaintiff was at all times ready, able and willing to fully comply with the terms of the contract and with the provisions of the law. Upon the whole case there is but one conclusion, and that is that the plaintiff is entitled to judgment as prayed for in the complaint.

The plaintiff urges that the court direct the defendant be compelled to restore its factory in New York and to make a mandatory provision in its decree to so provide. The complaint does not seek such specific relief in the prayer, but the omission to do so does not prevent this court from granting such a judgment, irrespective of the relief sought, as the evidence warrants and in order to carry into effect its mandate. In any event the plaintiff seeks " such other and further relief as to the court may seem just and proper." This is ample to warrant a judgment to compel the employer to return to New York in the event that a judgment is so awarded. A decree as is suggested by the plaintiff is, of course, drastic, but it is quite evident that some employers require drastic measures to awaken them to the fact that a welfare measure like the National Industrial Recovery Act must be adhered to if there is to be paid that respect which citizens owe to their country in the time of economic war. The defendant did not offer employment in its Clinton factory to all of its New York workers; it merely requested some twenty or thirty of them, most of whom were foremen of departments, to move to Clinton and continue to work for it.

The defendant, through its president, admitted on cross-examination that in seeking a new location for its factory it did not look anywhere in any of the boroughs of New York city or in Westchester county or in Long Island or elsewhere in the State of New York, except Beacon, N. Y.

The defendant offered as its sole excuse for moving to Clinton, Mass., the fact that the climate was drier in that place. The fact

of the matter is that the weather reports introduced in evidence by the plaintiff showed conclusively that the New York climate was in fact drier than the Clinton, Mass., climate, and that there was a greater normal and actual precipitation of rain during the past year in Clinton, Mass., than in New York city.

The defendant, even before it commenced operating its Clinton factory, applied to the National Recovery Administration for an exemption from the operation of the Code of Fair Competition for the Toy and Playthings Industry, so that it might employ all of its workers as apprentices for the period of five months at a weekly wage of six dollars for forty hours of work instead of employing only ten per cent of its total number of employees as apprentices for a period of six weeks at a weekly wage of nine dollars and sixty cents for forty hours' work.

Despite the denial by the National Recovery Administration of the defendant's petition, the latter employed as apprentices all of its workers (about 600 in number), except twenty or thirty whom it invited from New York.

The defendant paid to the New York pressmen, whom it invited to work in the Clinton factory, the sum of thirty-five dollars per week for forty hours or at the rate of eighty-seven and one-half cents an hour instead of ninety-five cents an hour as provided for under the agreement.

The defendant arbitrarily reduced in its Clinton factory the piece-rate prices which had been agreed upon in the New York factory for workers of average skill.

The defendant paid its workers in the Clinton factory single time for overtime.

The defendant insisted that the workers in the Clinton factory work more than eight hours' overtime per week.

The defendant operated three shifts in its Clinton factory.

The defendant destroyed the time cards of the week workers and production cards of the piece workers so that these records might not be subject to investigation by its own code authority and might not be produced at the trial.

The defendant continues to refuse to maintain a union shop in its Clinton factory despite Mr. Freundlich's statement upon the trial that he would agree to employ members in good standing of plaintiff's union whether they were regularly qualified workers or apprentices if the court should find that a provision for a "closed shop" does not violate section 7-a.

The plaintiff is entitled to an injunction permanently restraining defendant from violating the terms of the collective agreement, and it shall be in form similar to that of the temporary injunction

heretofore granted by Mr. Justice ROSENMAN.* The various defenses interposed by defendant are dismissed upon the merits.

Concededly the plaintiff is entitled to damages sustained by reason of defendants' deliberate breach of contract and in that respect the issue of the damages will be referred to a referee to take proof and determine. The decree shall not contain a provision at this time requiring the defendant to remove its factory from Clinton, Mass., to New York, for the reason that it is possible that the defendant may see the error of its ways in its endeavor to defeat the contract and the law, and see to it that the plaintiff union shall be used as a medium of furnishing the workers in accordance with the terms of the contract. The decree shall, however, provide that the plaintiff if necessary shall have the right to apply to this court for such further decree in order to carry into effect the provisions of the decree and of the full intentions of this court as may be required to compel the defendant to live up to its obligation fully and completely and with the same force and effect as if the factory was within the State of New York. If it shall appear after the entry of the judgment hereon that the defendant persists in violating the decree, the plaintiff may seek a further decree by amendment to the decree entered which shall contain a provision restraining the defendant from further violating its agreement in Clinton, Mass.

Settle findings on notice.

* 152 Misc. 761.